# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 14, 2004 Session

## KEITH DALE THOMAS v. STATE OF TENNESSEE

### Direct Appeal from the Circuit Court for Madison County
#### No. C02-336    Roger A. Page, Judge

--------

### No. W2004-00080-CCA-R3-PC

--------

The petitioner, Keith Dale Thomas, was convicted by a jury in the Madison County Circuit Court of first degree murder and possession of a deadly weapon with intent to employ it in the commission of an offense. He received a total effective sentence of life plus two years incarceration in the Tennessee Department of Correction. Subsequently, the petitioner filed a petition for post-conviction relief, alleging that his trial counsel and his appellate counsel were ineffective. The post-conviction court denied the petition, and the petitioner now appeals. Upon our review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

Joe H. Byrd, Jr., Jackson, Tennessee, for the appellant, Keith Dale Thomas.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; James G. Woodall, District Attorney General; and Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

At trial, the State adduced proof that on June 10, 1996, the petitioner and the victim were married. See State v. Keith Dale Thomas, No. W1999-01938-CCA-R3-CD, 2001 WL 124525, at *1 (Tenn. Crim. App. at Jackson, Feb. 6, 2001). Between 6:00 and 7:00 p.m. on June 10, 1996, the petitioner called the victim's sister and asked her to check on the victim. Id. The victim's sister called the victim's house. Id. The five-year-old son of the petitioner and the victim answered the telephone. Id. The victim's sister asked to speak with the victim, and the child replied that she was on the floor, dead. Id. The victim's sister drove her boyfriend and her mother to the victim's house.

Id. They found the pregnant victim still breathing. Id. An ambulance and police were called to the scene. Id. The petitioner arrived shortly thereafter, driving a burgundy Dodge Dynasty. Id.

The victim was taken to the hospital. Id. at *2. Police surveyed the premises and "found a shotgun in plain view in the crawl space underneath the rear of the house." Id. An officer recalled that a burgundy Dodge Dynasty had been parked just down the street from the scene of the crime earlier that day; however, when he returned to the location where the Dynasty was parked, there was a white Plymouth Neon in its place. Id. Police searched the petitioner's Dynasty and discovered a shotgun shell matching those used in the murder weapon. Id. Police noticed that the petitioner's house was in disarray, and there was a family photograph "with an X over the victim's face and a dot on the [petitioner's] head." Id.

Police discovered that the victim had been driving a white Plymouth Neon she had rented from Enterprise Rent-a-Car. Id. at *3. There was an additional key for the Neon in the petitioner's vehicle.

One of the victim's co-workers testified that on June 10, 1996, she and the victim finished working at Sears at approximately 6:00 p.m. Id. They left work and picked up their children from daycare. Id. The victim left the co-worker's house at 6:20 p.m., saying she was going home to prepare dinner. Id. At 6:29 p.m., the petitioner called the co-worker, inquiring about the victim's whereabouts. Id.

The petitioner's girlfriend, Anita Fouse,[1] testified that she and the petitioner had an intimate relationship. Fouse recalled that the petitioner began the relationship by telling Fouse that he was divorced. Id. at *5. Fouse asserted that she did not see the petitioner after 1:15 p.m. on the day of the murder. Id. Specifically, Fouse denied that she had been to Cato's with the petitioner on the day of the murder. Id. She explained that she had been in Cato's with the petitioner two weeks prior to the murder. Id. at *7. After the victim's death, the petitioner continued to deny to Fouse that he and the victim were married at the time of the victim's death. Id. at *5.

Kevin Washington, a Chester County Jail inmate, testified that he had previously been convicted of forgery and theft of property valued over $10,000. Id. at *6. Additionally, Washington admitted that he was facing thirty-one counts of forgery in Madison County. Washington asserted that prior to the murder, the petitioner gave him a book of checks in exchange for clothes and two shotguns. Id. After the murder, Washington and the petitioner were incarcerated together. Id. The petitioner told Washington that he "'committed the perfect crime and got away with it.'" Id. Then, the petitioner described how he killed the victim. Id. Additionally, the petitioner disclosed to Washington that he was trying to obtain a check that Fouse wrote on the day of the murder to help prove a possible alibi for himself. Id.

---

[1] This surname is spelled both "Fouse" and "Fous" in the record.

Barbara Perry, an employee of Cato's department store, recalled that the petitioner, Fouse, and a small boy had been in the store on a Monday shortly before the store closed at 7:00 p.m. Id. However, Perry could not remember the exact date that she had seen the petitioner.

Based upon the foregoing, the petitioner was convicted of premeditated first degree murder and possession of a deadly weapon with intent to employ it in the commission of an offense. He received a sentence of life with the possibility of parole for his murder conviction and a sentence of two years for his possession of a weapon offense. The trial court ordered the sentences to be served consecutively.

Subsequently, the petitioner, filed a pro se petition for post-conviction relief, alleging, among other grounds, the ineffective assistance of counsel. Counsel was appointed to assist the petitioner, and an amended petition was filed. Therein, the petitioner alleged that his trial counsel was ineffective in failing to thoroughly question Washington regarding his extensive criminal history, failing to interview the petitioner's son regarding the victim's murder, failing to obtain a copy of a check written by Fouse to Cato's on the day of the murder, failing to obtain daycare records to further pinpoint the victim's time of death, and failing to file pretrial motions. The petitioner also contended that appellate counsel was ineffective in raising only the issue of the sufficiency of the evidence on direct appeal.

At the post-conviction hearing, the assistant district attorney who prosecuted the petitioner testified that Washington contacted the District Attorney General's office, offering information relating to the victim's murder, as well as other murders.[2] Washington was awaiting trial on thirty-one felony forgery charges relating to bad checks and was attempting to curry favor by assisting the State. The prosecutor asserted that Washington was promised nothing in exchange for his testimony against the petitioner; however, cooperation was generally a factor considered when negotiating with an accused.

The prosecutor testified that he had filed a notice of enhanced punishment in Washington's forgery cases listing Washington's convictions in California and Arkansas. On the notice, the State included theft and forgery convictions in Arkansas. Additionally, the notice included California convictions of burglary, receiving stolen property, bad checks and grand theft. At the petitioner's trial, Washington testified that he had not been convicted of any offenses in California. The prosecutor testified at the post-conviction hearing that he did not know if Washington was lying because the information regarding the California convictions was obtained from an NCIC report and certified copies of the convictions were not obtained.

The prosecutor testified that during the petitioner's trial, he did not ask Washington to identify the murder weapon as being one of the shotguns that Washington had sold the petitioner. In fact, the prosecutor asserted that because the jury heard of Washington's extensive criminal history of crimes of dishonesty, he attempted to "distance" his prosecution from Washington's

---

[2] The other murders were committed by persons other than the petitioner.

testimony due to Washington's damaged credibility. The prosecutor specifically stated, "I argued that the case was proved beyond a reasonable doubt, even if the jury were to totally disregard the testimony of Mr. Washington." The prosecutor explained that he called Washington to testify primarily to elicit information that the petitioner revealed to Washington during their shared incarceration. The prosecutor stated that such information could only have been revealed by the perpetrator of the crime.

After the petitioner was convicted, the prosecutor received a letter purportedly written by Washington, recanting his testimony because the State had failed to honor their promises. After the recantation, the prosecutor received a second letter from Washington, asserting that the recantation had been written by an inmate named Tommy Warren. Washington admitted that he signed the letter but claimed that he did not read it. Washington denied that he lied at the petitioner's trial.

The prosecutor also testified that the District Attorney General's office had an open-file policy regarding discovery.

The petitioner's trial counsel testified at the evidentiary hearing that he met with the petitioner numerous times in preparation for trial. He and the petitioner had "a good communication relationship." Trial counsel hired an investigator to research Washington's criminal history, and he informed the petitioner of the findings. Trial counsel maintained that he was not suprised by any evidence the State produced at trial, noting that he obtained all of the necessary materials from the State via open-file discovery. Therefore, he saw no need to file pretrial motions. Trial counsel acknowledged that Washington denied any California convictions, and trial counsel did not challenge this assertion at the petitioner's trial. Trial counsel opined that Washington's credibility was already severely damaged and there was no need to pursue the issue further. Trial counsel stated, "I don't know how a liar, once you can show that he's a liar – He's a liar. I mean, how many times do you have to show it?"

Trial counsel denied ever hearing that the petitioner's son had stated that someone other than the petitioner committed the murder. Trial counsel admitted that he never interviewed the child, but he asserted that relatives informed him that the child would not talk about the incident.

Trial counsel could not recall anyone testifying as to the victim's precise time of death. Nevertheless, at trial, trial counsel attempted to provide an alibi defense for the petitioner. However, the petitioner's alibi witness, Fouse, denied being with the petitioner at the time of the murder. Trial counsel denied that the petitioner ever asked him to obtain a check purportedly written by Fouse to Cato's on the day of the murder. Additionally, trial counsel denied that the petitioner ever requested that counsel obtain records from the daycare center to verify the time that the victim picked up her children on the day of her death.

The petitioner testified that he asked trial counsel to obtain the check Fouse purportedly wrote to Cato's on the day of the murder and the daycare records showing the time the victim picked up her children on the day of the murder. The petitioner admitted that if the check existed, it would

only conclusively prove that Fouse was in Cato's on the day of the murder; the check alone would not provide the petitioner an alibi. The petitioner claimed that he and post-conviction counsel attempted to obtain the check, but the electronic records had been destroyed. Additionally, the petitioner claimed that he believed the daycare facility kept their records on computer for at least a year. Further, the petitioner complained that he asked counsel to have his clothes tested for gunpowder, blood, or tissue.

The petitioner stated that he did not know Washington prior to being incarcerated with him, and he further denied that he bought shotguns from Washington. The petitioner maintained that trial counsel could have more thoroughly investigated Washington's history and the substance of Washington's statement to police.

The petitioner complained that he never met his appellate counsel; he merely communicated with appellate counsel through correspondence.[3] Appellate counsel never asked the petitioner which issues the petitioner would like to raise on direct appeal. Regardless, the petitioner testified that he wrote to appellate counsel, informing him of the issues he wished to raise on direct appeal.

Thomas R. Warren, Jr., testified at the post-conviction hearing that he was serving a ninety-nine-year sentence for rape and had been incarcerated for almost thirty years. Warren was housed in the Nashville Correctional Facility and did "legal work" within the jail. According to Warren, Washington came to Warren's cell seeking legal assistance. Washington inquired as to possible methods to compel the State to honor an agreement they made to give Washington favorable treatment in exchange for manufactured testimony against various parties, including the petitioner. Warren wrote letters to the petitioner and the District Attorney General's office, indicating that Washington wanted to recant his testimony due to the State's noncompliance with their agreement. Warren denied receiving any benefit in exchange for writing the letters for petitioner. Warren maintained that Washington "knew all along that it was [Warren's] intent to try to undo the messiness that he [Washington] had made in testifying against these people."

At the conclusion of the post-conviction hearing, the post-conviction court entered an order denying the petition for post-conviction relief. The court found that the petitioner had failed to meet his burden of establishing by clear and convincing evidence that he received ineffective assistance from his counsel. The petitioner now appeals.

## II. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C.

---

[3] Appellate counsel did not testify at the post-conviction hearing.

Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id.

"To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). In evaluating whether the petitioner has met this burden, this court must determine whether counsel's performance was within the range of competence required of attorneys in criminal cases. See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

As we noted earlier, the petitioner alleges that his trial counsel was ineffective in failing to thoroughly question Washington as to his extensive criminal history, failing to interview the petitioner's son regarding the victim's murder, failing to obtain a copy of a check written by Fouse to Cato's on the day of the murder, failing to obtain daycare records to further pinpoint the victim's time of death, and failing to file pretrial motions. The petitioner also contends that appellate counsel was ineffective in raising only the issue of the sufficiency of the evidence supporting his conviction on direct appeal.

First, we note that Washington's extensive criminal history involving crimes of dishonesty was clearly before the jury. Moreover, both the prosecutor and trial counsel noted that Washington's credibility with the jury was nil. Accordingly, the petitioner has failed to demonstrate how failing to further question Washington regarding his criminal past was prejudicial.

The petitioner also complains regarding trial counsel's failure to interview his son about the murder. However, the petitioner's son did not testify at the post-conviction hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit this witness might have offered to the petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. Id. Accordingly, the petitioner has failed to demonstrate prejudice in this regard.

As to the petitioner's complaints regarding trial counsel's failure to obtain Fouse's check and the daycare records, the petitioner has failed to prove that such records existed or that they would have been beneficial to his case. Therefore, the petitioner has again failed to establish prejudice.

Further, the petitioner bemoans trial counsel's failure to file pretrial motions. However, the petitioner concedes that he was not prejudiced by counsel's failure to file pre-trial motions. This issue is without merit.

Finally, the petitioner argues that his appellate counsel should have met with him and raised additional issues on direct appeal. However, this court has previously observed,

> "[F]ailure to preserve and/or assert all arguable issues on appeal is not per se ineffective assistance of counsel, since the failure to do so may be a part of the counsel's strategy of defense. Counsel is not constitutionally required to argue every issue on appeal, or present issues chosen by his client. The determination of which issues to present on appeal is a matter of counsel's discretion."

State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986) (quoting State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984)). Moreover, "[a]ppellate counsel are not constitutionally required to raise every conceivable issue on appeal." Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004). The petitioner has failed to prove what prejudice he suffered as a result of any alleged deficiency of appellate counsel.

### III.  Conclusion

Finding no error, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE